IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 15, 2013

IN RE **CHRISTOPHER K. W.**[1]

**Appeal from the Juvenile Court for Monroe County**
**No. J12263      J. Reed Dixon, Judge**

_____

**No. E2013-01255-COA-R3-PT-FILED-FEBRUARY 11, 2014**

_____

This appeal involves the termination of a biological father's parental rights with regard to his son. The child at issue was removed from the custody of the mother as a result of the mother's drug use and neglect. The child, now five years of age, did not have a significant relationship with the father, if any. Following a hearing, the juvenile court terminated the father's parental rights for failure to substantially comply with the responsibilities of the permanency plan. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

W. Tyler Weiss, Madisonville, Tennessee, for the appellant, Christopher B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Jordan Scott, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.  BACKGROUND**

_____

[1]This court has a policy of protecting the identity of children in parental rights termination cases by using initials instead of the last names of the parties.

Christopher B. ("Father") was arrested for simple possession of methamphetamine in March 2010. The juvenile court subsequently entered an order preventing contact between Father and his son, Christopher K. W. ("the Child") (d.o.b. 6/2/2008) because of Father's methamphetamine use. The court order provided that Father's visitation with the Child could resume once Father completed 30 days of clean drug screens and presented himself to the court.

Father had not provided proof of 30 days of clean drug screens by the time the Department of Children's Services ("DCS") became involved with the Child in January 2011, as a result of methamphetamine use and child neglect by the Child's mother, Crystal W. ("Mother").[2] DCS obtained a protective custody order and began an investigation. An adjudication of dependency and neglect was entered on April 4, 2011. As to Father, the trial court concluded that the Child was dependent and neglected based on Father's methamphetamine use and the unresolved no-contact order.

On February 2, 2011, DCS held the initial child and family team meeting to discuss the development of a permanency plan. DCS attempted to contact Father about the meeting but had no working phone numbers or address by which to reach him. Interestingly, the day after the meeting, Father presented to the DCS office. At that time, case manager Kristy Bledsoe informed him of the next court date and the upcoming permanency plan meeting scheduled for February 23rd. However, Father did not attend the plan meeting. The resulting plan provided that the Child entered State custody because the parents were "involved with methamphetamines," had not been cooperative, had employment issues, and were known to move around. It required Father to: 1) complete an alcohol and drug assessment and follow the recommendations of the assessment; 2) submit to and pass random drug screens; 3) have a legal source of income; and 4) obtain stable housing and remain in one home for a minimum of four months. The plan was ratified on May 15, 2011.

In November 2011, DCS developed a second permanency plan. In addition to the previous requirements, it mandated that Father: 1) not reside with anyone who is using or making illegal drugs or involved in any illegal activity; 2) have drug free housing; 3) report to and meet with DCS; and 4) cooperate with the child support office to establish paternity and make child support payments. The trial court ratified the second plan on March 25, 2012.

Except for maintaining a legal source of income, Father failed to complete all the plan requirements. Accordingly, DCS filed a petition to terminate his parental rights on June 28, 2012, citing as grounds substantial noncompliance with the permanency plans and

_____

[2]Mother's rights were terminated by order dated April 25, 2013. She is not a party in this appeal.

abandonment for failure to provide child support. Testimony was heard at hearings on November 30, 2012, and January 14, 2013. Witnesses included former DCS case manager Bledsoe, Child Protective Services team leader Millicent Thomas, current DCS case worker Kelley Hunt, foster mother Jessica W., Father, DCS supervisor Rebecca Woods, and Mother.

Evidence presented at the hearings revealed that Father made no effort to be reunited with the Child. The proof before the court revealed that Father never addressed the requirements of the no-contact order. Although he contended that he had met the demands of the order, Father never presented any proof to DCS. Further, despite being told the dates of the dependency and neglect hearing and the permanency plan meeting, Father failed to attend.

Ms. Bledsoe testified that at the time of the March 3, 2011 hearing, Father had not cooperated with DCS. Despite his claims that he was in contact with former case worker Shannon Waldrop through either March, April, or May, 2011, Father admitted during his testimony that he "actually never tried to contact" DCS from Spring 2011 until January 2012, during which time DCS did not have his address or a working phone number to reach him. Father further acknowledged that he "didn't do anything" in that time period to obtain custody of the Child.

Ms. Hunt, the assigned case manager in late January 2012 when Father visited the DCS office, testified that she went over both permanency plans and the criteria for termination of parental rights "in-depth" with Father. Additionally, she provided him with the contact information for DCS and inquired if he needed any assistance. However, Father declined any help, but subsequent to this meeting DCS was able to maintain some contact with Father by phone. At Father's request, Ms. Hunt set up a court date on March 15, 2012, for ratification of the second permanency plan and for Father to present himself to the court in an attempt to remove the no-contact order. She contacted Father to make him aware of the court date and to urge him to attend because his appearance would help him regain visitation with the Child. Father failed to present himself to the court. When Father moved back to Tennessee in May 2012, he did not provide DCS with updated contact information after the move.

DCS provided three drug screens for Father. The first screen was conducted on February 3, 2011, and a second on March 25, 2011. He failed the first screen for benzodiazepines and either oxycodone or opiates. Father claimed he had prescriptions for the medications that resulted in the positive result, but he never produced the documentation. Father passed the second screen. DCS thereafter lost contact with Father. When Father resurfaced in January 2012, DCS conducted a third drug screen, which Father passed. Because he was living out of state and did not attend any meetings or court dates, DCS could

not provide drug screens for Father after January 23, 2012. Father failed to provide documentation that he was submitting to drug screens in Georgia, the state in which he claimed to be living. Once he returned to Tennessee, Father remained inaccessible for drug screens because he was a truck driver and rarely physically present.

Father also failed to complete an alcohol and drug assessment and to show compliance with its recommendations. During the January 2012 meeting with DCS, Father asserted to Ms. Hunt that he had already completed a drug assessment and treatment. He continued claiming that he had completed this requirement even after the termination petition was filed. Ms. Hunt did not schedule an assessment for Father, but she requested documentation proving the satisfaction of that requirement. Father never provided any proof. In August 2012, Ms. Hunt again sought the required documentation from Father, at which time he stated he would provide it within a week. He never provided it.

Furthermore, Father failed to maintain stable and appropriate housing as required by the permanency plans. Father claimed to have rented a house by himself in Georgia, but upon his return to Tennessee in May 2012, he lived with a "buddy" for about a month and then moved into his mother's house. However, his mother had "a history of methamphetamine use" and previously was incarcerated for such activity. Father additionally showed no stability in that he worked as a truck driver and was only at his mother's house two days every two weeks.

Father likewise failed to provide any child support for the Child. He acknowledged that Ms. Hunt explained to him that he was required to contact the child support office and to pay support and that he signed the criteria for termination of parental rights, which likewise included the support requirement. Father admitted that he reviewed the permanency plan requirements in great detail with Ms. Hunt and understood the action steps that he was required to complete. He also testified that he was aware that noncompliance would result in termination of his parental rights. At the time of these events, Father was paying support on another child and knew the proper procedure. Additionally, he had previously paid support to Mother before DCS obtained custody of the Child. Nevertheless, Father did not pay any child support in the four months preceding the filing of the termination proceeding. He likewise failed to provide any items to DCS to help support the Child.

Since removal from Mother, the Child and his sister have lived in a safe and stable pre-adoptive foster home with relatives Jessica and Larry W. Jessica was acquainted with the children before they entered her care. Both Jessica and Larry are employed. Testimony at trial revealed that when the Child first came into foster care, he had a tendency to wander off, sometimes with strangers. That behavior was corrected in the foster home. At the time of the hearing, the Child was in preschool and his situation was described as "wonderful."

He attended church with the foster family and had settled into a routine. Jessica reported that she is attached to him and that he likewise is attached to her. Jessica testified that it was her intention to adopt the Child and his sister if the rights of the parents were terminated.

On April 25, 2013, the trial court found by clear and convincing evidence that Father failed to substantially comply with the responsibilities of the permanency plan. The court found that Father did not provide proof that he had completed an alcohol and drug assessment or followed recommendations and that he had not submitted to and passed random drug screens with the frequency necessary to demonstrate that he was no longer involved in drug use. The court further determined that Father had income and housing, but did not pay child support or make his home available for inspection. The court concluded that DCS made "all reasonable efforts to assist [Father] to address these issues."

It was further determined by the court that termination of Father's parental rights was in the Child's best interest because he had not made changes in his conduct that would make it safe to place the Child in his care. Specifically, the court found that Father was essentially homeless and had no meaningful relationship with the Child because he had not seen or spoken to him for almost three years. The court noted that Father had not consistently paid child support and showed "little to no interest in the welfare" of the Child "as evidence by [his] failure to maintain contact with the Department." By contrast, the Child was strongly bonded with his foster parents, was doing well, and would benefit from permanency. Accordingly, the court entered an order terminating Father's parental rights. Father filed this timely appeal of the trial court's ruling.

## II. ISSUES

The issues raised in this appeal are as follows:

a. Whether clear and convincing evidence supports the court's termination of Father's parental rights for substantial noncompliance with the statement of responsibilities in the permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

b. Whether clear and convincing evidence supports the court's finding of reasonable efforts by DCS pursuant to Tennessee Code Annotated section 37-1-166(g)(1).

c. Whether clear and convincing evidence supports the court's ruling that termination of Father's parental rights was in the best interest of the Child

pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving

the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV.  DISCUSSION

### A.

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights.  The applicable provisions read as follows:

> **36-1-113.  Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> (b)  The prospective adoptive parent . . . shall have standing to file a petition . . . to request termination of parental or guardianship rights . . . .
>
> (c) Termination of parental or guardianship rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> * * *
>
> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . . :
>
> * * *
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . .

Tenn. Code Ann. §§ 36-1-113(g)(2). The party petitioning for termination carries the burden of proof. *In re M.J.B.*, 140 S.W.3d at 653. The requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

To establish substantial noncompliance, the court must initially find "that the requirements of a permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. Conditions that necessitate foster care placement "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

The court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656. To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Father's duties under the plans were to: 1) complete an alcohol and drug assessment and follow the recommendations of the assessment; 2) submit to and pass random drug screens; 3) have a legal source of income; 4) report to and meet with DCS; 5) obtain stable, drug-free housing and remain in one home for a minimum of four months; and 6) to not reside with anyone who is using or making illegal drugs or involved in any illegal activity. We find that the duties required of Father were reasonable and relevant in light of Father's conviction for methamphetamine use, his no-contact order with the Child for drug use, his failed drug test on February 3, 2011, his failure to maintain contact with DCS from Spring 2011 to January 2012, and the inherent dangers of methamphetamine use and production in a child's home.

With the exception of maintaining a legal source of income, Father failed to comply with his permanency plan requirements in every respect. He failed to complete an alcohol and drug assessment and to follow the recommendations of the assessment. Father likewise failed to meet with DCS and to regularly submit to drug screens. He failed to maintain stable and appropriate housing. Father likewise failed to provide any child support for the Child.

Father testified that he reviewed the permanency plan requirements with Ms. Hunt and understood the action steps that he was required to complete. He acknowledged awareness that noncompliance would result in termination of his parental rights. Moreover, Father was aware of the methodology for paying child support because he was already paying child support on another child and had previously paid support to Mother before the Child's removal. Nevertheless, Father did not pay any child support in the four months preceding the filing of the termination proceeding.

Thus, clear and convincing evidence shows that Father violated almost every requirement of the plans. Accordingly, the court properly terminated Father's parental rights for substantial noncompliance with the requirements of the permanency plans.


**B.**


DCS is required to make "reasonable efforts" to "preserve, repair, or restore parent-child relationships whenever reasonably possible." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn. Ct. App. Mar. 9, 2004). Tennessee Code Annotated section 37-1-166(g)(1) defines these reasonable efforts as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). DCS's efforts must be reasonable, but are not required to be "herculean." *In re Giorgianna H.*, 205 S.W.3d at 519. DCS need not "shoulder the burden alone." *In re Q.E.*, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008).

Rather:

> Reunification of a family . . . is a two-way street, and neither law nor policy require the Department to accomplish reunification on its own without the assistance of the parents. Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody. They must also make reasonable efforts to rehabilitate themselves once services have been made available to them.

*In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *6 (Tenn. Ct. App. Sept. 28, 2006); *see also In re S.H.*, M2007-01718-COA-R3-PT, 2008 WL 1901118, at *9 (Tenn. Ct. App. Apr. 30, 2008).

The reasonableness of DCS's efforts must be decided on a case-by-case basis. To determine whether DCS made reasonable efforts, a court should consider the following factors:

(1) the reasons for separating the parent from his or her child or children,

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the separation,

(5) the resources available to DCS,

(6) the duration of the parent's remedial efforts, and

(7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the DCS's efforts.

*In re C.M.M.*, 2004 WL 438326, at *7.

In this case, DCS's attempts to provide assistance were thwarted by Father. DCS explained Father's plan requirements "in-depth" and provided him with DCS's contact information. DCS also asked Father if he needed any assistance. Father, however, did not keep his contact information current and never requested any help. DCS was unable to aid him in any way because he consistently told the caseworkers that he already completed an assessment and treatment. He promised documentation of his compliance but never provided

-10-

it. DCS could not provide regular or random drug screens because Father was living or working as a truck driver out of state. He did not attend any meetings or court dates.

Father had employment and income, but he nevertheless chose to live with a known methamphetamine user. He likewise failed to pay child support even though DCS explained the importance that he do so. Despite knowledge of the proceedings and his obligations, he did not appear in court, attend DCS meetings, or do anything to resolve the no-contact order prohibiting his contact with the Child. From Spring 2011 to January 2012, Father admittedly "didn't do anything" to try and regain custody of the Child and "actually never tried to contact" DCS.

Though Father met with DCS in January 2012, he did not become more involved after the meeting. Instead, he promptly missed a court appearance that DCS requested on his behalf. He failed to update his address with DCS after he moved back to Tennessee in May 2012, and failed to even maintain contact with his own attorney in this matter. Remedial responsibility does not rest solely with DCS -- a parent also must make reasonable efforts to rehabilitate himself and to remedy the conditions that required him to be separated from his child. *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002). In light of Father's lack of effort in this case, the court correctly concluded that DCS provided reasonable efforts.

## C.

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Father's parental rights, we must consider whether termination of Father's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
>> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>>
>> (2) Whether the parent or guardian has failed to effect a lasting

-11-

adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2012). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict

shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The proof clearly reveals that termination of Father's parental rights was in the Child's best interest. Father made no effort to resolve the no-contact order preventing his visitation with the Child that had been in place since 2010. He therefore has had no contact with the Child in nearly three years when the Child was only two years old. Father has had no meaningful relationship with the Child. *See* Tenn. Code Ann. § 36-1-113(i)(3)-(4). Father likewise made no effort to: demonstrate that he had resolved his drug use, pay child support, maintain contact with DCS, comply with the plan requirements, show up for hearings, or even maintain contact with his attorney. He was only present at his "residence" for a few days out of the month, and he resided with his mother, who had spent time in jail for methamphetamine use. Accordingly, the court properly determined that Father did not make a lasting adjustment of circumstances to make it safe and in the Child's best interest to be in his home. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2), (5), (7), and (9).

In contrast, the Child and his sister are currently placed in a safe and stable pre-adoptive foster home with relatives of Mother. The Child is doing well, and moving him from a home where he is thriving and attached to his foster parents would have a negative emotional and psychological effect on him. *See* Tenn. Code Ann. § 36-1-113(i)(5). Our focus must be on what is in the best interest of the Child before us.

In consideration of all of the foregoing factors, the trial court correctly concluded that clear and convincing evidence established that termination of Father's parental rights is in the best interest of the Child.

# V. CONCLUSION

The judgment of the trial court is affirmed and this cause is remanded. The costs of the appeal are assessed to the appellant, Christopher B.

_____
JOHN W. McCLARTY, JUDGE